George M. WHELAN and Mary Ann Whelan, Plaintiffs,

v.

TRANS UNION CREDIT REPORTING AGENCY, IAG Federal Credit Union and TRW, Defendants.

No. CV–93–2155.

United States District Court, E.D. New York.

Sept. 8, 1994.

Edward P. Kelly, Fisher, Fallon, Salerno, Betlesky & Kelly, New York City, for plaintiffs.

Mark E. Kogan, Marion, Satzberg, Trichon & Kogan, Philadelphia, PA, for defendant, Trans Union Corp.

Herbert Teitelbaum, of counsel, Teitelbaum, Hiller, Rodman, Paden & Hibsher, New York City, for defendant Trans Union Corp.

Roger Goodnough, Hart & Hume, New York City, for defendant IAG.

Brett Lev, Jones, Day, Reavis & Pogue, New York City, for defendant TRW, Inc.

### MEMORANDUM AND ORDER

GLASSER, District Judge:

Defendants Trans Union Credit Reporting Agency ("Trans Union"), IAG Federal Credit Union ("IAG") and TRW Inc., sued here as TRW ("TRW"), each moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This court granted IAG's motion from the bench on August 19, 1994; the merits of that motion, as addressed on the record, will not be reviewed herein. Presently before the court are the motions of defendants Trans Union and TRW. For the reasons described below, both motions are granted.

### FACTS

This action arises out of the efforts of plaintiffs George M. Whelan and Mary Ann Whelan to refinance a mortgage on their property at 19 Mianus Drive, Bedford, New York (the "Bedford Property") in January 1992. Sometime prior to January 1992, the Whelans had obtained a mortgage on the Bedford Property through IAG, the employ-

ee credit union used by Mr. Whelan's former employer, IBM. In early January 1992, Mrs. Whelan, who had been a real estate agent at Caldwell Banker Real Estate for more than sixteen years, decided to explore the possibility of refinancing the Bedford Property to take advantage of the low mortgage rates then available. She accordingly approached Fran Gillespie, a registered mortgage broker at Dearie Mortgage Service Group with whom she had enjoyed extensive business contacts. Before the Whelans submitted an application for refinancing or paid any fee, Mrs. Gillespie ran a pre-approval credit check on their record. At this point, Mrs. Gillespie discovered that the Whelans' credit reports from TRW and Trans Union contained derogatory information—specifically, the reports indicated that the Whelans were 180 days late in their mortgage payments to IAG.

Mrs. Whelan immediately telephoned the credit grantor at IAG, who informed her that " 'it was an error and 30 others went out this month in error.' " M. Whelan Dep. at 22.[1] The same afternoon, Mr. Whelan went to IAG's office in Rye, New York and picked up a letter dated January 9, 1992, which was addressed "To Whom It May Concern" and stated as follows:

> Mr. Whelan's account ... is current and to date with payments. Mr. Whelan has been current with his payments for the past (12) months.

> This is and [sic] TRW error in reporting and is being investigated and will be corrected.

Affidavit of Brett M. Lev, Sworn to June 30, 1994 ("Lev Aff.") Ex. D; *see also* G. Whelan Dep. at 108. The Whelans provided Mrs. Gillespie with the letter, but Mrs. Gillespie nonetheless advised them not to pursue the refinancing; according to Mrs. Gillespie, the letter was unsatisfactory because it failed to address the period involving the allegedly

delinquent payments: November and December 1991. Affidavit of Edward P. Kelly, Sworn to Aug. 11, 1994 ("Kelly Aff.") Ex. 2. The Whelans did not submit an application for refinancing at this time.

It is undisputed that the Whelans contacted neither TRW nor Trans Union regarding the alleged inaccurate information contained in the January 1992 credit reports. At deposition, the Whelans conceded that they took no steps to correct the reports after contacting IAG in January 1992 because they believed that "[t]he issue was to be cleared by IAG[.]" M. Whelan Dep. at 98, 66; G. Whelan Dep. at 109; *see also* Pls.' 3(g) Statement ¶ 9. For its part, IAG alleges that it forwarded to Mr. Whelan a second "To Whom It May Concern" letter, dated March 3, 1992, in which it indicated that the erroneous information was the result of "an internal problem with [its] credit data reporting[.]" Affidavit of Roger A. Goodnough, Sworn to June 30, 1994 ("Goodnough Aff.") Ex. I; J. In addition, IAG alleges that it prepared documents known as "Bullseye Reports," dated January 13, 1992 and March 3, 1992, which it transmitted to TRW to notify TRW of the error. Goodnough Aff.Ex. I; J. TRW maintains that its records reveal that prior to the lawsuit, TRW received no correspondence from subscribers or other third parties relating to either plaintiff. Affidavit of Kelly Currie, Sworn to June 27, 1994 ("Currie Aff.") ¶¶ 9–11.

In July 1992, Mrs. Whelan approached Kelly Germa at Sears Mortgage about refinancing the mortgage on the Bedford Property. Once again, before an application was completed, Ms. Germa advised Mrs. Whelan that derogatory information appeared on the Whelans' credit reports.[2] Mrs. Whelan contacted IAG by telephone regarding the inaccurate information; however, she did not contact TRW or Trans Union. M. Whelan Dep. at 66, 98. Mrs. Whelan testified at

---

1. Citations to the transcript of the deposition upon oral examination of Mary Ann Whelan and George M. Whelan, conducted on March 7, 1994, will be referred to as "M. Whelan Dep." and "G. Whelan Dep.," as appropriate.

2. The evidence regarding the timing of these events is somewhat confused: Mrs. Whelan testi-

fied that she did not discover that the inaccurate information still was contained in the credit report until July 1992, when she received a copy of her Trans Union report. M. Whelan Dep. at 63, 73–74, 77. However, she also testified that she knew "this was still an issue" in March or April 1992. M. Whelan Dep. at 78.

deposition that she was satisfied that the erroneous information had been corrected in August 1992, when she obtained accurate reports from TRW and Trans Union. M. Whelan Dep. at 74. However, the Whelans never submitted any application to refinance the Bedford Property, either before or after August 1992. M. Whelan Dep. at 77–78; G. Whelan Dep. at 117.

The Whelans put the Bedford Property up for sale in September 1992, and ultimately sold the property in March 1993. According to Mrs. Whelan, they "sold [their] property at a big differential because it was sold in a very low price range in the state market." M. Whelan Dep. at 77.

Plaintiffs thereafter commenced this action in the New York State Supreme Court, Queens County, on or about March 26, 1993,[3] and defendants removed the action to this court by Notice of Removal filed May 14, 1993. In their Complaint, plaintiffs allege seven causes of action against defendants. The first through fourth causes of action allege that defendants breached their obligations to plaintiffs under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq. (the "FCRA"), and the New York Fair Credit Reporting Act, N.Y.Gen.Bus. Law §§ 380 et seq. (the "NYFCRA"), and that such breach was willful and/or recklessly indifferent, entitling plaintiffs to recover both actual and punitive damages. The fifth cause of action alleges that the reports prepared and/or published by defendants defamed plaintiffs, and the sixth cause of action alleges a claim for unreasonable invasion of plaintiffs' privacy. Finally, in their seventh cause of action, plaintiffs seek attorneys' fees under the FCRA and the NYFCRA.

Subsequent to the commencement of this action, on April 15, 1993, IAG forwarded a letter to Trans Union advising it to "change Mr. George M. Whelan's profile to show a current/satisfactory payment record for 12/91" under the IAG account. Kelly Aff.Ex. 3. IAG forwarded a second letter to Trans

Union dated March 28, 1994, together with a Trans Union Consumer Dispute Verification Form, stating that it "had already corrected this members [sic] credit profile back in April of 1993," and advising Trans Union to delete all delinquent or negative reported information. Kelly Aff.Ex. 3.

## DISCUSSION

### I. *Summary Judgment Standards*

Summary judgment is appropriate when the moving party establishes that there exist no genuine issues of material fact that bar the court from granting judgment as a matter of law. Fed.R.Civ.P. 56(c).

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial*." ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted) (emphasis in original). Therefore, summary judgment may be granted if "the evidence is merely colorable, ... or is not significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). It is axiomatic that in ruling on a motion for summary judgment, the judge's function is not himself to weigh the evidence and determine the truth of an issue, but merely to determine whether there is an issue to be tried. *Id.* at 249, 106 S.Ct. at 2510–11.

### II. *Analysis*

Both TRW and Trans Union are consumer reporting agencies as defined in the FCRA.[4]

---

**3.** Defendants maintain that the action was commenced on or about April 15, 1993.

**4.** As defined in the FCRA, the term "consumer reporting agency" means

any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers

In their first through fourth causes of action, plaintiffs allege that defendants breached their obligations as consumer reporting agencies "by failing to ensure that the consumer reports [they] prepared and/or contributed to ... were accurate to the maximum possible extent," and that defendants "failed to follow reasonable procedures to assure the accuracy of the reports" they prepared and/or contributed to. *See* Compl. ¶¶ 14–16, 26. Plaintiffs further allege that defendants' violation of the FCRA and the NYFCRA was "willful and/or recklessly indifferent."[5] *See* Compl. ¶¶ 22, 31. The court construes these allegations as pleading claims under §§ 607 and 611 of the FCRA, 15 U.S.C. §§ 1681e(b) and 1681i(a).[6]

### A. The § 1681e(b) Claim

■■■ Turning first to plaintiffs' claims under § 1681e(b), that section states in relevant part as follows:

> Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

15 U.S.C. § 1681e(b). To succeed on a claim under this section, a plaintiff must establish that: (1) the consumer reporting agency was negligent in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (2) the consumer reporting agency reported inaccurate information about the plaintiff; (3) the plaintiff was injured; and (4) the consumer reporting agency's negligence proximately caused the plaintiff's injury. *Houston v. TRW Info. Servs., Inc.*, 1989 WL 59850 (S.D.N.Y. May 2, 1989) (*citing Morris.v. Credit Bureau of Cincinnati, Inc.*, 563 F.Supp. 962, 967 (S.D. Ohio 1983)), *aff'd*, 896 F.2d 543 (2d Cir.1990); *see also Neptune*

*v. Trans Union Corp.*, 1993 WL 505601, at *1–2 (E.D.Pa. Dec. 8, 1993) (articulating same requirements), *aff'd*, 27 F.3d 558 (3d Cir.1994). In considering a challenge pursuant to § 1681e(b), the "threshold question" is whether the challenged credit information is accurate; if the information is accurate, "no further inquiry into the reasonableness of the consumer reporting agency's procedures is necessary." *Houston v. TRW Info. Servs., Inc.*, 707 F.Supp. 689, 691 (S.D.N.Y.1989); *see also Boothe v. TRW Credit Data*, 768 F.Supp. 434, 437 (S.D.N.Y.1991). But even if the information is inaccurate, a credit reporting agency is not held strictly liable under the FCRA merely for reporting it; rather, the consumer must show that the agency failed to follow reasonable procedures in generating the inaccurate report. *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir.1991); *Stewart v. Credit Bureau, Inc.*, 734 F.2d 47, 51 (D.C.Cir.1984); *Neptune*, 1993 WL 505601, at *2. To defeat a motion for summary judgment on a § 1681e(b) claim, a plaintiff "must minimally present some evidence from which a trier of fact can infer that the consumer reporting agency failed to follow reasonable procedures in preparing a credit report." *Stewart*, 734 F.2d at 51.

#### 1. Claim Against Trans Union

■■■ Trans Union essentially concedes that its report contained inaccurate information. *See* Memorandum of Law in Support of Trans Union Corporation's Motion for Summary Judgment ("Trans Union Mem.") at 6. Indeed, plaintiffs have produced Trans Union credit reports dated July 2, 1992 and February 24, 1994, which clearly contain the adverse information regarding their mortgage payments. *See* Kelly Aff.Ex. 4, 5. However, Trans Union alleges that plaintiffs' claims

---

for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. 15 U.S.C. § 1681a(f).

5. Section 1681o creates civil liability for negligent noncompliance with the FCRA, and renders a consumer reporting agency liable for actual damages, costs and reasonable attorneys' fees. 15 U.S.C. § 1681o. Section 1681n creates civil liability for willful noncompliance and renders

an agency additionally liable for punitive damages. 15 U.S.C. § 1681n.

6. The provisions of the NYFCRA are essentially identical to those of the FCRA, and have been construed using the same standards applicable to the federal act. *See, e.g., Milbauer v. TRW, Inc.*, 707 F.Supp. 92 (E.D.N.Y.1989); *Klapper v. Shapiro*, 154 Misc.2d 459, 462, 586 N.Y.S.2d 846, 849 (N.Y.Sup.Ct.1992).

are precluded because it followed reasonable procedures as required by the FCRA, and because in any event, the claims are entirely speculative. The court concludes that due to plaintiffs' failure to present any evidence showing that Trans Union was notified prior to April 15, 1993 that its credit report concerning the Whelans contained inaccurate information, Trans Union is entitled to summary judgment on plaintiffs' claim under § 1681e(b).

As stated above, plaintiffs have conceded that they did not contact Trans Union directly to notify it that inaccurate information appeared on their credit reports. Plaintiffs instead base their claim on two pieces of correspondence from IAG to Trans Union: the first, dated April 15, 1993, directed Trans Union to change Mr. Whelan's report "to show a current/satisfactory payment record for 12/91"; and the second, dated March 28, 1994, indicated that IAG had received from Trans Union a Consumer Dispute Verification Form regarding the negative information and was "deeply concerned" because IAG "had already corrected this members [sic] credit profile back in April of 1993." Kelly Aff.Ex. 3. However, there is no evidence in the record which would indicate that Trans Union actually was notified about the inaccurate information by either plaintiffs or a third party prior to April 15, 1993.[7] In short, plaintiffs have failed to generate a question of fact regarding whether Trans Union even was informed prior to the commencement of this action and prior to the Whelans' sale of the Bedford Property that inaccurate information appeared on the Whelans' credit report. This lack of proof is fatal to their claim under § 1681e(b).

2. *Claim Against TRW*

■ Before considering plaintiffs' claim against TRW pursuant to § 1681e(b), it is useful to review the following background information TRW has provided about its operations and procedures. Upon request and payment of a nominal fee, consumers are entitled to receive a copy of their credit reports. If a consumer has been denied credit, the consumer may receive a free report upon making a request within sixty days of such denial. Currie Aff. ¶ 3. The credit report includes instructions as to how consumers can dispute items on their reports and cause TRW to initiate a reinvestigation of the disputed items. Currie Aff. ¶ 3 & Ex. A. When a consumer disputes information contained in a credit report, TRW attempts to verify the disputed information and, if appropriate, corrects its files to reflect the current information provided by the source. Currie Aff. ¶ 4. If disputed information is not confirmed by the source within twenty-four business days, it is deleted from the report or updated to reflect the consumer's version of the dispute. Currie Aff. ¶ 4. Consumers then are sent updated credit reports and are advised of their right to have the reports sent to third parties who received inaccurate reports.[8] Currie Aff. ¶ 4.

TRW's computer database does not store actual consumer reports, but rather stores millions of pieces of trade data linked to identifying information which are constantly updated and are searched each time a consumer report is requested and generated. Currie Aff. ¶ 6. Due to the fluid nature of the database, at any given time, TRW only can generate a credit report based on the then-current information existing in the database; consequently, TRW generally cannot retrieve a consumer credit report as it existed in the past. Currie Aff. ¶ 6. TRW would have access to a printed copy of a credit report only if "as part of TRW's consumers relation function, the consumer requested a

---

7. Plaintiffs' efforts to rely on the January and March 1992 "To Whom It May Concern" letters as proof that IAG contacted Trans Union at this time are unavailing in light of the fact that IAG gave the letters only to Mr. Whelan, and there is no indication that Trans Union ever received copies of the letters.

8. It also is relevant to note that TRW is not required to repeat a reinvestigation simply because a consumer resubmits a dispute; rather, the consumer must provide additional evidence that the item is inaccurate or incomplete. When an investigation does not conclusively resolve a dispute, a consumer is given the opportunity to submit a brief statement setting forth the nature of the dispute, which TRW adds to the consumer's credit report. Currie Aff. ¶¶ 4–5.

copy of the report," or if a consumer filed a dispute with respect to an item and TRW retained a copy of the report sent to the consumer. Currie Aff. ¶ 6.

Turning now to the merits of plaintiffs' claim against TRW, TRW disputes that inaccurate information appeared on the Whelans' credit report based on the fact that "plaintiffs have not produced any evidence that TRW reported inaccurate information" and, as explained above, TRW alleges that it is unable to retrieve a copy of the Whelans' credit report as it appeared in January 1992. *See* Memorandum of Law in Support of Defendant TRW Inc.'s Motion for Summary Judgment ("TRW Mem.") at 9. In response, plaintiffs argue that based on the actual credit reports available and the sworn testimony of both plaintiffs, "this court must assume that the derogatory information appeared on a TRW credit report during the time in issue; to wit January 1992 through April 15, 1993." *See* Memorandum of Law in Opposition to Defendant TUC's Defendant IAG's and Defendant TRW's Motions for Summary Judgment ("Pls.' Mem.") at 4. The court notes that plaintiffs' allegation that the derogatory information remained on the report until April 15, 1993 is inconsistent with Mrs. Whelan's statement at deposition that the TRW report had been corrected in August 1992. M. Whelan Dep. at 74. In addition, the court notes that the only TRW credit report that appears in the record is dated January 7, 1992, and it is not apparent that this report reflects derogatory credit information.[9] However, based on the fact that IAG alleges it sent TRW "Bullseye Reports" dated January 13, 1992 and March 3, 1992, purportedly to correct inaccurate information appearing on TRW's reports, and based on the Whelans' testimony at deposition, and construing all evidence in a light most favorable to plaintiffs for purposes of this summary judgment motion, the court concludes that plaintiffs have shown that there is a question of material fact concerning whether the TRW report contained inaccurate information within the meaning of § 1681e(b).

As stated above, even assuming the TRW report contained inaccurate information, the FCRA does not make reporting agencies strictly liable for all inaccuracies. *Cahlin*, 936 F.2d at 1156. Rather, "[t]he agency can escape liability if it establishes that an inaccurate report was generated by following reasonable procedures[.]" *Id.* The standard for evaluating the reasonableness of an agency's procedures is "'what a reasonably prudent person would do under the circumstances.'" *Houston*, 707 F.Supp. at 693 (citation omitted); *see also Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir.1986), *cert. denied*, 483 U.S. 1022, 107 S.Ct. 3267, 97 L.Ed.2d 766 (1987). Evaluating the reasonableness of an agency's procedures involves balancing the potential harm from the inaccuracy against the burden on the agency of safeguarding against such inaccuracy. *Houston*, 707 F.Supp. at 693; *Wiggins v. Equifax Servs., Inc.*, 848 F.Supp. 213, 219 (D.D.C.1993).

The Whelans do not dispute that they failed to avail themselves of the mechanisms TRW offers to consumers to challenge information contained in their credit reports, nor do they challenge the general reasonableness of those procedures, as outlined above. They nonetheless argue that TRW failed to follow reasonable procedures to correct their credit reports once IAG notified TRW about the inaccurate information. TRW alleges that it has no record of receiving any correspondence from the Whelans *or* from any subscribers or other third parties relating to either plaintiff prior to the date of the lawsuit. Currie Aff. ¶¶ 9–11. IAG maintains that it sent Bullseye Reports relating to the Whelans' credit reports to TRW in January and March 1992. *See* Goodnough Aff.Ex. I, J. Thus a question of fact exists as to whether TRW was on notice that inaccurate information was contained in the Whelans' credit reports, which precludes granting summary judgment to TRW on the issue of the reasonableness of its procedures with respect to the Whelans.

9. Plaintiffs' proofs are difficult to evaluate because the credit reports the parties have submitted are barely legible due to both the poor quality of the copies and the lack of instruction as to how to interpret the reports.

TRW also argues that it is entitled to summary judgment on the ground that plaintiffs have failed to establish any basis for an award of damages based on TRW's alleged violation of § 1681e(b). More specifically, TRW contends that plaintiffs have failed to produce any documentary evidence establishing monetary loss due to TRW's allegedly unreasonable procedures, and that in any event, their unsupported "itemization of special damages" was produced outside of the discovery period; and that plaintiffs have failed to show that TRW's acts proximately caused their alleged injury because plaintiffs have conceded that they never actually applied to refinance the Bedford Property.

Plaintiffs have an affirmative duty of coming forward with evidence in support of their claim that they were caused damage due to TRW's alleged inaccurate report. *Cahlin,* 936 F.2d at 1161; *Neptune,* 1993 WL 505601, at *2. The court finds that even putting aside TRW's argument that plaintiffs have failed to present any independent documentation of their alleged damages and that their damages report should be precluded because it was produced outside of the discovery period, plaintiffs' proof on the issue of causation is grossly deficient. It is undisputed that plaintiffs never submitted an application to refinance the Bedford Property, and they therefore never were rejected for credit. Plaintiffs' argument—based on the opinion of two mortgage brokers—that if they had submitted an application, it would have been denied, is entirely speculative; indeed, Mrs. Gillespie—upon whose testimony plaintiffs heavily rely—states only that in January, she advised the Whelans "that it was most unlikely that they would be approved for a mortgage," and in July, she "recommended they clear up this situation before submitting an application and a $500 fee." Kelly Aff.Ex. 2. Moreover, plaintiffs have conceded that they never submitted an application for refinancing after August 1992, when, according to Mrs. Whelan, she was satisfied that the inaccurate information had been deleted from the TRW credit report.

Furthermore, plaintiffs' argument pursuant to Rule 56(f) of the Federal Rules of Civil Procedure that "should it become necessary in this Court's view, plaintiff [sic] can obtain further affidavits in support of their claim," Pls.' Mem. at 8, is without merit. A party seeking discovery pursuant to Rule 56(f) "must file an affidavit explaining (1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Hudson River Sloop Clearwater, Inc. v. Department of Navy,* 891 F.2d 414, 422 (2d Cir.1989) (*citing Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir. 1985)). In the first place, plaintiffs' failure to file an affidavit under Rule 56(f) "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate," *Paddington Partners v. Jean–Louis Bouchard,* 34 F.3d 1132 (2d Cir.1994); in the second place, plaintiffs generally have failed to satisfy the other requirements imposed under Rule 56(f). In short, plaintiffs have failed to meet their burden of showing that the alleged inaccurate information on TRW's credit report caused them damages, or that they are entitled to further discovery on this issue, and TRW is entitled to summary judgment on this basis. *Accord Guimond v. Trans Union Credit Info. Co.,* 1993 WL 102756, at *5 (N.D.Cal. Mar. 22, 1993) (granting defendant's motion for summary judgment where plaintiff failed to show how incorrect entries on her credit report proximately caused her any economic or emotional damage).

## B. *The 1681i(a) Claim*

Plaintiffs' allegations also can be construed as alleging a claim against Trans Union and TRW under § 1681i(a).[10] In relevant part, that section provides:

---

10. Defendants fail to address plaintiffs' claims under this section; for example, TRW maintains that apart from their claim under § 1681e(b), "[p]laintiffs have not alleged any other violation of the FCRA and NYFCRA." Reply Memorandum of Law in Support of Defendant TRW Inc.'s Motion for Summary Judgment ("TRW Reply") at 1 n. 1. However, in their responses to TRW's interrogatories, plaintiffs asserted that "Defendant TRW violated § 611(a) by failing to reinves-

If the completeness or accuracy of any item of information contained in his file is disputed by a consumer, *and such dispute is directly conveyed to the consumer reporting agency by the consumer,* the consumer reporting agency shall within a reasonable period of time reinvestigate and record the current status of that information unless it has reasonable grounds to believe that the dispute by the consumer is frivolous or irrelevant. If after such reinvestigation such information is found to be inaccurate or can no longer be verified, the consumer reporting agency shall promptly delete such information. . . .

15 U.S.C. § 1681i(a) (emphasis added).

Plaintiffs' claims under this section can be disposed of readily. The claims suffer from the same deficiencies discussed in the foregoing sections. In addition, plaintiffs have conceded that they failed to contact TRW and Trans Union directly to convey to them the dispute regarding the accuracy of the information on their credit reports. At most, there is a question regarding whether *IAG* provided this information to TRW and Trans Union; however, the FCRA requires that the information be conveyed *by the consumer* directly to the credit reporting agency. *See Cahlin,* 936 F.2d at 1160 (credit reporting agency has a duty under § 1681i(a) to investigate and correct inaccurate information brought to its attention "by the consumer"); *Wiggins,* 848 F.Supp. at 220 (noting that there was a disputed issue of fact regarding whether plaintiff consumer complained directly to credit reporting agency, "a requirement for liability under § 1681i(a)"). Hence TRW and Trans Union are entitled to summary judgment on plaintiffs' claim under § 1681i(a) that they failed to reinvestigate the current status of the derogatory credit information within a reasonable period of time.

### C. *Defamation and Invasion of Privacy Claims*

▬▬▬▬ Plaintiffs' claims for defamation and invasion of privacy are governed by 15

U.S.C. § 1681h(e), which provides in relevant part as follows:

[N]o consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, *except as to false information furnished with malice or willful intent to injure such consumer.*

15 U.S.C. § 1681h(e) (emphasis added). Plaintiffs attempt to overcome the qualified immunity accorded defendants under this section by arguing that there is an issue of fact with respect to whether defendants acted with malice and/or willful intent based on the length of time the allegedly false information remained on their credit reports. While the term "willful" is not defined under the FCRA, it has been interpreted in this context as requiring a showing that the agency " 'knowingly and intentionally committed an act in conscious disregard for the rights of others.' " *Wiggins,* 848 F.Supp. at 219 (*citing Stevenson v. TRW Inc.,* 987 F.2d 288, 293, 294 (5th Cir.1993)). Courts considering what constitutes "malice" under this section have borrowed the meaning of the term used in the context of libel litigation, *see New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); in other words, an allegedly defamatory statement will be deemed to have been made with malice if the speaker knew it was false or acted with reckless disregard of its truth or falsity. *See, e.g., Thornton v. Equifax, Inc.,* 619 F.2d 700, 705 (8th Cir.), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980); *Wiggins,* 848 F.Supp. at 223 & n. 17.

Merely reciting these standards makes readily apparent that plaintiffs have failed to generate a question of material fact regarding whether Trans Union and TRW acted willfully or maliciously. Obviously, there can

---

tigate the current status of the information within a reasonable period of time." *See* Supplemental Affidavit of Brett M. Lev, Sworn to Aug. 16,

1994 Ex. A ¶ 7. The court therefore liberally construes the Complaint as pleading a claim under § 611(a).

be no question that Trans Union acted with the requisite intent given that it was not even put on notice that its report contained inaccurate information until April 15, 1993. With respect to TRW, plaintiffs' proof consists solely of their statement that "at trial, they shall succeed in proving based upon the testimony and evidence presented, that defendants indeed both invaded plaintiffs' privacy and defamed the plaintiffs." Pls.' Mem. at 6. This challenge fails to raise more than a metaphysical question as to whether plaintiffs currently have any such proof in support of their claim. In addition, it warrants brief mention that plaintiffs have failed to provide sufficient evidence with regard to the "great mental pain and anguish" and other injury they allegedly have suffered as the result of defendants' actions. Thus defendants are entitled to summary judgment on the defamation and invasion of privacy claims.[11]

### CONCLUSION

For all the foregoing reasons, TRW's and Trans Union's motions for summary judgment are granted in their entirety.

SO ORDERED.

---

**11.** It is hardly necessary to state that in light of the foregoing conclusion that TRW and Trans Union are entitled to summary judgment on the first through sixth causes of action, they also are entitled to summary judgment on plaintiffs' request for attorneys' fees in the seventh cause of action.